## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| DIANE JOHNSON and | ) | |
| ANDRE JOHNSON, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | |
| v. | ) | 1:17-cv-02601-TWT |
| | ) | |
| DEKALB COUNTY, GEORGIA, et al., | ) | |
| Defendants. | ) | |
| | ) | |

### PLAINTIFFS' RESPONSE TO DEFENDANTS'
### STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiffs offer the following response to Defendants' statement of

undisputed material facts, showing that many of the purported "facts" are sharply

disputed.

1. On July 11, 2015, Plaintiffs Diane and Andre Johnson went to
   Bigelow's Bar and Grill, located at 2564 Gresham Road, along
   with Andre's sister Shayla to meet their friends, Charity and
   Anthony Chambers. (D. Johnson Dep. pp.15:14- 16:21; A.
   Chambers Dep pp. 17:23-19:23).

**Response:   Undisputed.**

2. At some point during the night, Charity Chambers and Shayla
   Johnson engaged in a verbal altercation inside Bigelows, cursing at
   one another to the extent they had to be separated. (D. Johnson
   Dep. pp. 19:11-22:20).

**Response:   Disputed in part and irrelevant. It is disputed because Ms.**

**Chambers and Shayla Johnson argued briefly, but separated themselves**

**without event and began to leave the premises without event. C. Chambers**

**Dep. 72:20–73:10.**

**It is irrelevant because Defendants do not claim that anything that**

**occurred inside Bigelow's as a justification for arresting or detaining the**

**Johnsons, or even claim that any of the officers involved in the arrest had any**

**reason to suspect that the Johnsons had engaged in any type of "altercation"**

**inside Bigelow's.**

3. The Chambers decided to leave and the Johnsons left shortly
   thereafter out a side back door. (D. Johnson Dep. p. 22:1-2; A.
   Johnson Dep. pp. 38:19-22).

**Response:   Disputed in part. The door they used to exit was a side door (not a**

**back door) at the front of the building that was not marked in any way that it**

**should not be used as a means of egress. Ex. H, Diane Johnson Decl. ¶ 2.**

**The allegation is also immaterial for the reasons set forth in response to**

**the previous statement of fact.**

4. Officer Fulton, working an extra job at Bigelows that evening,
   heard the couples as they exited out the side back door. (Fulton
   Dep. p.80:2-11; pp.81:24- 82:1).

**Response:**   Undisputed that Fulton was working an extra job at Bigelow's. It is disputed that Fulton encountered "the couples" as they exited Bigelow's. The deposition portions cited do not support the proposition set forth. Fulton's testimony was that he was in his car around the opposite corner at the time the couples left. *See* portions of Fulton Dep. cited by Defendants. Fulton's testimony was that he was first alerted to Plaintiffs by employees leaving the bar who came and got him from his vehicle. Fulton Dep. 83:7–13. Further, Fulton did not hear any conversation with the Johnsons because there was no such conversation at that time. D. Johnson 22:21–23:2 (explaining that there was no verbal altercation between Ms. Chambers and Shayla Johnson while outside of Bigelow's), 26:9–24 (testifying that Officer Fulton engaged with the Chambers first, and that the Johnsons did not speak to him until after they drove past after Fulton had pulled his patrol car behind the Chambers' car).

5.   At the time Officer Fulton first encountered the couples, there was a line of people trying to get in and out of the establishment. (Fulton Dep. p.82:8-21).

**Response:**   Disputed. First, Fulton encountered the couples at separate times, first meeting the Chambers and then the Johnsons after Fulton had seized the

3

Chambers by pulling his car behind them. *See, e.g.*, D. Johnson Dep. 26:9–16.

Second, there was never a line of people waiting to get inside of Bigelow's

during the relevant time; people could come right in without waiting. *See*

Declaration of Diane Johnson ¶ 9; Ex. J, Charity Chambers Decl. ¶ 22.

6. Fulton was posted at the side door when multiple employees came running out the door in a panic to inform him that there was fighting going on inside. (Fulton Dep. pp. 83:1-84:20; pp.84:25-85:4; p.85:5-7).

**Response:    Disputed for two reasons, and immaterial.**

The allegation is immaterial because Defendants do not make any

showing that this information had any relation to the Johnsons' arrests. There

is no foundation laid concerning Fulton's knowledge of whether the Johnsons

were part of the same party as the Chambers, or whether they engaged in any

conduct inside Bigelow's that could form the basis of an arrest or detention.

To whatever extent this allegation is material, it is disputed. First,

Fulton's testimony was that he was inside his car parked away from any door

at the time the Plaintiffs exited the premises. Fulton Dep. 80:5–14; *see also*

Exhibit B, Map of Bigelow's, (marked as Pl. Ex. 8) (showing location of

Chambers' car, which was near Fulton's car, which was not close to the doors,

4

which were located at the end of the sidewalk and on the opposite side of the building).

Second, no employee came out of the door—much less in any panic—to tell Fulton anything. *See* Ex. H, Diane Johnson Decl. ¶ 14; Ex. J, Charity Chambers Decl. ¶ 17. Fulton Dep. 83:7–23; 88:22–89.

The evidence shows that the Chambers left Bigelow's after the disagreement between Charity and Shayla and that Officer Fulton encounter the Chambers as they exited the side door of Bigelow's. *See* A. Chambers Dep. 15:12-17.

A jury could easily find there is simply no span of time in which an employee could see the Chambers disagreement which was not loud and did not attract attention (*see* C. Chambers Dep. 23:15-17), run through the front door, alert Officer Fulton, who claims he was sitting his car (*see* Fulton Dep. 80:10-13), and for Officer Fulton to then intersect with the Chambers as they exit the door (*see* Fulton Dep. 92:3-18).

The totality of this evidence shows that a jury could reject Officer Fulton's claim that employees or patrons informed him of any altercation inside the bar, and instead a jury could find that Fulton overheard a comment

5

**Ms. Chambers made to her husband, and then inserted himself into the conversation by threatening to arrest and tase Ms. Chambers if she continued to use profanity.** *See* **C. Chambers Dep. 32:12-17 (testifying that Officer Fulton threatened to arrest and tase her if she continued to use profanity); A. Chambers Dep. 17:1-8 (testifying that Officer Fulton told Ms. Chambers "you need to shut the fuck up before I tase you and take you to jail").**

7.    Officer Fulton testified that he noticed the Chambers couple exiting the side door in a hurry and heard Charity Chambers say "fuck that bitch Imma beat that hoe ass." (Fulton Dep. p. 86:5-17; p. 68:1-5).

**Response:    Disputed and immaterial.**

**First, Ms. Chambers did not state that she was going to do any harm to any person. At most, she said "the hell with this girl or maybe the hell with this bitch." C. Chambers Dep. 37:13–14; A. Chambers Dep. 16:15–16.**

**Second, Ms. Chambers walked in a normal and unremarkable gait, not as if she was in a hurry. Ex. J, Charity Chambers Decl. ¶ 10.**

**Whether Ms. Chambers did say she was going to "beat" someone is immaterial because there is no evidence that the person she was referring to was present or face-to-face with her. C. Chambers Decl. 12–13. There is no evidence that she was walking towards that persons, and no other evidence of**

6

imminent violence. **Moreover, there is no evidence that the Johnsons made**

**this statement, participated in it, or that this statement had anything**

**whatsoever to do with this statement. D. Johnson Decl. ¶¶ 5, 6.**

8.   Fulton testified that he noticed that the Chambers couple had a
     look of anger on their faces and assumed that their expression was
     a result of whatever had occurred on the inside of Bigelows.
     (Fulton Dep. pp. 87:23-88:9).

**Response: Disputed and immaterial**

**It is disputed because Fulton had no knowledge of what happened on**

**the inside, *see* ¶ 6, *infra*, and thus no basis to make any reasonable**

**assumptions about any facial expression which occurred during a**

**conversation he was not part of.**

**It is immaterial for the same reason explained previously: Fulton's**

**encounter with the Johnsons began when they exited their car to observe the**

**Chambers' detention. It did not begin earlier than that, and whatever look the**

**Chambers allegedly had on their "faces" has nothing whatsoever to do with**

**the Johnsons' arrest.**

9.   Fulton testified that he was especially alarmed because the side
     door that the Chambers exited from is mostly used by employees,
     police, or patrons who are looking for an escape route after they
     have engaged in a fight or other altercation on the inside. (Fulton.
     Dep. p. 85:8-22).

**Response:   Disputed and immaterial.**

**Disputed because there are no markings on the door that it should not be under normal circumstances used or that it should only be used in an event of a confrontation.** *See* **Ex. H, Diane Johnson Decl. ¶ 2; Ex. J, Charity Chambers Decl. ¶ 8. Fulton testified that he was unaware of any indication that the door in question was not to be used for any normal purposes. Fulton Dep. 145:15–19.**

**Immaterial because, as stated, this information has nothing to do with the Johnsons' subsequent arrests.**

10. Fulton testified that the door the Chambers couple used is commonly referred to as "a fighting door." (Fulton Dep. p.85:23-24).

**Response:   Disputed and immaterial for the reasons set forward in response to ¶ 9. In addition, the cited portion of Fulton's deposition testimony does not support the notion that anyone (other than Plaintiffs' counsel, in an attempt at levity) has ever referred to that door as "a fighting door" at any previous time. The cited portion certainly does not support the notion that the door "commonly" bore that appellation.**

11. Officer Fulton testified that regular patrons from inside came outdoors and pointed out the Plaintiffs and the Chambers couple as

the persons who had engaged in an altercation on the inside.
(Fulton Dep. pp. 88:16-90:17).

**Response:   Disputed and unsupported by the record.**

Fulton's testimony was that multiple regular patrons came from the front door, Fulton Dep. 89:14–15, to alert him to what was happening with the Chambers and Johnsons. The testimony from Diane Johnson and Charity Chambers is that no one came outside and had any interaction with Fulton. Ex. H, Diane Johnson Decl. ¶ 16; Ex. J, Charity Chambers Decl. ¶ 16.

Even crediting Fulton's testimony, the evidence cited by Defendants does not support that anyone identified "the Plaintiffs and the Chambers couple" as the persons who had engaged in an altercation. Fulton testified that patrons stated "it was them," but Fulton never clarified that "them" referred to the Johnsons. *See* Fulton Dep. 88:16–90:17. The evidence surrounding the incident, which shows that the Johnsons did not encounter Fulton until later, and did not exit Bigelow's at the same time as the Chambers, reinforces that a jury would not be required to find that Fulton had been told the Johnsons engaged in any conduct inside Bigelow's, or that Fulton had been given any warning whatsoever.

9

12.  Officer Fulton and the Chambers had a verbal confrontation as the Chambers exited Bigelows. (Fulton Dep. pp.95:24-96:22; pp. 97:7-98:6; A. Chambers Dep. pp. 18:1-3).

**Response:   Undisputed, but who initiated, who was the aggressor, and who said what and how in the conversation is disputed. Also immaterial as there is no evidence that the Johnsons were present for this confrontation or had any role in it.**

13.  Plaintiffs were on their way to their car when they observed the Chambers couple speaking to Officer Fulton. (D. Johnson Dep. pp. 26:9-27:23; A. Johnson Dep. pp.51:2-52:15).

**Response:   Disputed. The testimony from the Johnsons was that they "went straight" to their car, pulled it around the back of Bigelow's, and only then noticed the Chambers being engaged with Fulton on the opposite side of the building. *See* D. Johnson Dep. 23:3–24; 26:9–27:23; A. Johnson Dep. 51:2–52:4.**

14.  Plaintiffs witnessed Officer Fulton's vehicle blocking the Chambers in and positioned themselves so that they could see and hear the conversation. (Compl. ¶19; A. Johnson p.53:3-17).

**Response:   Undisputed, except that the evidence shows that the Johnsons were not able to hear each part of the conversation between Fulton and the Chambers. Although the complaint contains a statement that Plaintiffs**

10

positioned themselves so they could "see and hear" the conversation between Fulton and the Chambers, the complaint provides no other details and does not specifically state that the Johnsons actually heard the conversation or the point in time at which either of them were able to hear any portion of the conversation between Fulton and the Chambers. Ms. Johnson's testimony was that when she encountered Officer Fulton she "hadn't gotten to the car. I was far enough away where I could try to *kind of hear* . . . ." D. Johnson Dep. 35:9–13 (emphasis added). *See also id.* 31:2–8 (stating that she was aware that Fulton was claiming that Mr. Chambers identified himself as a police officer). Andre Johnson testified that he did not hear the conversation between the Chambers and Officer Fulton. A. Johnson Dep. 69:13–17.

15. Diane Johnson admitted that because she was calmer than her husband at the time, she got out the car first to see what was going on between the Officer and her friends. (D. Johnson pp. 27:7- 28:1).

**Response:   Disputed in part. Ms. Johnson testified that Mr. Johnson was "just as calm and respectful." D. Johnson Dep. 47:22–23; *see also id*. 69:21–22. It appears that Ms. Johnson's comment was related to her disposition when compared to her husband's generally.**

11

16. After Diane Johnson approached Officer Fulton, he informed her that Anthony Chambers had identified himself as a police officer. (Fulton Dep pp.106:25-107:15; D. Johnson Dep. p. 28:18-20).

**Response:    Undisputed that Fulton claimed that to be the case.**

17. Officer Fulton testified that the Chambers and Ms. Johnson became hostile towards Officer Fulton, inciting each other and speaking ill of the police. (Fulton Dep. pp. 109:17-100:11).

**Response:    Disputed that the Chambers or Ms. Johnson were at any point hostile.** *See* **D. Johnson Dep. 66:12–14 ("I wasn't gonna fight him. I wasn't gonna scream and holler. I didn't do anything."); A. Chambers Dep. 25:17–25 (denying using profanity or making anti-police comment attributed to him by Fulton); Ex. H, Diane Johnson Decl. ¶ 7; C. Chambers Decl. ¶¶ 26, 39, 41.**

18. Officer Fulton testified that he ordered Ms. Johnson to back away from the scene because she was exhibiting an aversion to law enforcement by interrupting his investigation while the Chambers fed off of her negative energy. (Fulton Dep. pp. 109:17-110:11).

**Response:    Disputed. Ms. Johnson was not interrupting any investigation and only asked Fulton for his name.** *See* **D. Johnson Dep. 38–40. Ms. Johnson was only asked to move after Fulton approached her and knocked the phone out of her hand. D. Johnson Dep. 46:2–4.**

19. Diane Johnson laughed at Officer Fulton and said she planned to retrieve her phone from her car and record their encounter. (D. Johnson Dep. 29:1-23).

12

**Response:   Undisputed.**

20. Officer Fulton testified that he advised Ms. Johnson that she could record but needed to do so at a distance that did not interfere with his investigation and conversation with the Chambers. (Fulton Dep. 107:10-15; p. 108:16-23).

**Response:   Disputed that Fulton said all of these statements. Ex. H, Diane Johnson Decl. ¶ 12 (stating that Fulton said that she could retrieve her phone to record, but did not say anything about the distance she had to remain from him or any ongoing investigation).**

21. When Diane Johnson returned to her car to get her phone, her husband got out the car. (D. Johnson Dep. p. 30:12-18).

**Response:   Undisputed.**

22. Officer Bowe and Harden had arrived to provide back-up assistance to Officer Fulton. (Bowe Dep p. 8:16-18; p.9:7-10; Harden Dep. p. 11:2-9; p.15:3- 6).

**Response:   Undisputed.**

23. Bowe and Harden testified that they immediately noticed the crowd forming outside and the tumultuous atmosphere and rushed to locate Fulton, who was still at the Chambers vehicle. (Bowe Dep p. 12:14-23; p. 18:16-25; Harden Dep. p. 17:6-20; p.22:7-11; p.30:6-9).

**Response:   Disputed. There was not a crowd, A. Johnson Dep. 48:12–18, and there was not a tumultuous atmosphere. At most there were a couple of**

13

persons in the parking lot other than the Chambers, Johnsons, and law

enforcement. *See also* Ex. H, Diane Johnson Decl. ¶¶ 8, 10.

24. The officers testified that Mr. Johnson made his way through the parking lot crowd and was given verbal commands to step back. (Fulton Dep. p. 113:2-11; p.118:7-10; Bowe Dep. p. 27:2-15; p. 28:12-29:6; pp. 29:15-30:22; pp. 30:23- 31:8; Harden Dep. p. 24:3-25; pp.27:12-24).

**Response: Disputed. There was no crowd. *See* A. Johnson Dep. 48:12–18. Mr.**

**Johnson walked in the direction of the Chambers' car, but did not get close,**

**when Fulton approached him and pushed him. *See* A. Johnson Dep. 110:24–**

**111:7.**

25. According to the officers, Mr. Johnson was irate, belligerent and agitating the situation by insisting on getting involved in the Chambers' detention. (Bowe Dep. p. 27:2-15; 28:12-29:6; pp. 29:15-30:22; pp. 30:23-31:8; Fulton Dep. p. 113:23-114:22; pp.115:19-116:15; Harden Dep. p. 24:3-25).

**Response:    Disputed. Andre Johnson came a reasonable distance towards**

**Fulton before Fulton approached him, and Andre Johnson simply asked what**

**was going on. *See* A. Johnson Dep. 54:19–4.**

26. Andre Johnson said to the officers that "this is some bullshit," and referred to the officers as "motherfuckers." (A. Johnson Dep. pp. 57:20-58:13; Fulton Dep. pp. 112:22-113:18).

**Response:   Undisputed. Mr. Johnson was pushed by Fulton and told he could**

**not use profanity. Mr. Johnson testified that when he was walking away he**

**said, "[Fulton said] you cannot say bullshit, and I say I can say whatever I**

**want to say. I say its a freedom of speech and use the MF word." A. Johnson**

**Dep. 57:20–58:13.**

27. Officer Harden recalls Andre Johnson saying "Fuck the police,
    fuck DeKalb police, this is some fuck shit." (Harden Dep. p.24:3-
    6).

**Response:   Disputed. Andre Johnson specifically denied making any such**

**statements. *See* A. Johnson Dep. 92:21–24.**

28. Officer Fulton testified that he was concerned that the Plaintiffs
    were causing a public disruption and making it difficult for the
    officers to control the crowd and keep the peace. (Fulton Dep.
    pp.117:22-118:6).

**Response:   Disputed. There was no crowd. *See* A. Johnson Dep. 48:12–18.**

**There was no threat of a disruption of the peace that came from Plaintiffs. *Id.***

**at 111:7 (describing Fulton approaching him to push him); D. Johnson Dep.**

**58:4–16 (describing Fulton respond to a question for his name by coming up**

**to her and knocking her phone out of her hand); Ex. H, Diane Johnson Decl.**

**¶¶ 8–10.**

29. Officer Fulton testified that because the scene was chaotic and Mr. Johnson continued to act in an erratic manner and refused to leave the premises, Mr. Johnson was placed under arrest for disorderly conduct. (Fulton Dep. pp.113:23- 114:22; pp.115:19-116:15).

**Response:   Disputed as to what the underlying facts are, but Fulton so testified. Andre Johnson was walking away as instructed when he was approached and arrested from behind. A. Johnson Dep. 57:20–58:13. Andre Johnson did not behave in any erratic way, other than stating his disagreement with Fulton's admonition not to use profanity. *Id.* Both Bowe and Fulton arrested Andre Johnson. Bowe Dep. 51:1–6.**

30. Diane Johnson returned to the scene and stood behind Officer Fulton to begin recording. (D. Johnson Dep. pp. 44:25-45:19; Fulton Dep. p. 109:8-16).

**Response:   Disputed to the extent that such fact could be construed to indicate that Ms. Johnson was anywhere other than where Fulton indicated that she could be. The evidence shows that Ms. Johnson stood at the wall where Fulton instructed her to be. *See* D. Johnson Dep. 46:4–6; *see also* Fulton Dep. 108:22–23 ("I recall telling her yeah, it's to record, just record over this way."). Ms. Johnson always maintained at least a vehicle between her and Fulton. Ex. H, Diane Johnson Decl. ¶ 11.**

**Plaintiffs further note that the portion of Ms. Johnson's testimony cited by Defendants comes from a different portion of the events, apart from when she retrieved her phone and after Fulton had already knocked the phone from her hands.** *See, e.g.*, **D. Johnson Dep. 31:2–8 (describing her going closer to the building where the Chambers car was and not focusing on her husband as in the cited portion of her testimony);** *see also* **Harden Dep. 31:21–24 ("Q.: When D. Johnson arrived with her cellphone to film, this is after Mr. Johnson has been placed in handcuffs in the back seat of the patrol car? A.: Correct.").**

31.  Fulton testified that he was initially unbothered by the fact that Ms. Johnson was attempting to record, but her negative attitude, her rants about police coupled with the close proximity within which she was recording, began to make him uneasy. (Fulton Dep. pp. 109:23-110:18).

**Response:   Undisputed that Fulton so testified, but the veracity of such testimony and the facts underlying it are sharply disputed.**

**The facts show that Diane Johnson was recording up against the wall where Fulton told her to be and that the only thing she said to him prior to him slapping the phone out of her hand was to ask for his name. Thus, it is apparent from these facts that (a) she made no rants about police and (b) she was in the proximity that Fulton had instructed, which was not preventing**

17

**Fulton from accomplishing any task.** *See* **D. Johnson Dep. 33:19–34:4;** *Id.* **at 46:4–6;** *see also* **Fulton Dep. 108:22–23 ("I recall telling her yeah, it's to record, just record over this way.");** *id.* **at 38:2–5 ("I'm not sure how I was in his way because the Chambers were over there. I was back behind this vehicle where there was nothing that he was doing at the point where I was.");** *id.* **at 54:3–6 (testifying that she said nothing and "stood there and I was just listening and I thought my phone was recording" before Fulton approached her); Ex. H, Diane Johnson Decl. ¶¶ 7, 13–14.**

32. Diane Johnson admitted she was within at least eight feet of the officer and had the phone up to his face to record. (D. Johnson Dep. pp. 36:25-37:2; pp.44:25-45:19).

**Response:    Disputed in part.**

**Ms. Johnson had her phone up so that she could record, but did not extend her hand so that the phone was "up to his face." Ex. H, Diane Johnson Decl. ¶ 13; D. Johnson Dep. 37:3–6;** *id.* **at 38:6–11 ("Q.: So it's not your contention that you were close enough to him to be in his face? A:. No. Q.: Okay. But he was close enough to you where he could knock the phone out of your hand? A.: Because he walked toward me."). Ms. Johnson was also in the proximity that Fulton has instructed.** *See* **¶ 31,** *infra***.**

18

33. Diane Johnson continued to record, despite being told by Officer Fulton several times to step back, leave and get away from the scene of his investigation. (Fulton Dep. pp. 111:12-112:21; D. Johnson Dep. p. 46:4-6; p. 56:19-23; T. Harden Dep. p.31:6-13; p.32:3-22).

**Response:    Disputed in multiple respects.**

**First, Ms. Johnson was never able to record. She attempted to and thought she had recorded, but was thwarted by confusion and having her phone slapped from her hand. D. Johnson Dep. 54:5–6.**

**Second, Fulton never told Ms. Johnson to back up. D. Johnson Dep. 45:20–23. Fulton did tell Ms. Johnson to leave "his scene," but only at a point in time where she was standing where Fulton had previously instructed. *Id.* at 56:20–23.**

**Third, Ms. Johnson was never in any area that would interfere with Fulton's investigation. D. Johnson Dep. at 38:2–11.**

34. Ms. Johnson admits that she initially came back with her phone, she stood at a distance and listened to the encounter between the Chambers and Fulton but then eventually interrupted Fulton's conversation with the Chambers while maneuvering around the car from one side to the other, asking the officer questions. (D. Johnson Dep. pp.53:13-59:23).

**Response:    Disputed. Portions of the testimony cited by Defendants show that their fact is not supported, much less undisputed.**

19

**Ms. Johnson testified that she never interrupted the conversation between Fulton and the Chambers, and only asked a question (what was his name?) when Fulton approached her. D. Johnson Dep. 53:9–10; 54:1–2.**

**Ms. Johnson also testified that she "stood back" and did not get closer to the officers, always putting a car between her and the officers at the very least. D. Johnson Dep. 55:11–19.**

**She also testified that she did not ask any question so as to interrupt anything. D. Johnson Dep 53:23–54:2**

35. According to Officer Fulton, all of this motion by Ms. Johnson made him very uncomfortable and other people in the crowd even resorted to telling her to back away as she was situated within feet of him and hovering over the officer's back. (Fulton Dep. p. 112:8-21; Harden Dep. p.31:6-13; p.32:3-22).

**Response:   Disputed.**

**First, Fulton testified that it was the *proximity* of Ms. Johnson to him that made him feel uncomfortable, not her *movement* as stated in this fact. Fulton Dep. 112:12–15. As stated elsewhere, the proximity quoted by Fulton in the cited portion of his testimony is sharply disputed.**

20

**Second, there was no crowd,** *see* **A. Johnson Dep. 48:12–18, and no**

**civilian told Ms. Johnson to back up as claimed by Fulton,** *see* **Ex. H, Diane**

**Johnson Decl. ¶ 15.**

36.  While directing Ms. Johnson to back up and give him some room to conduct his investigation, Officer Fulton made contact with Ms. Johnson's hand or wrist, which caused her phone to fall to the ground. (Fulton Dep. 119:2-25).

**Response:   The facts in the first clause of this sentence are disputed. When**

**Fulton approached Ms. Johnson and slapped the phone out of her hand, she**

**was not under arrest and she was standing where Fulton had told her to be,**

**separated from the officers by vehicles, and was listening. Fulton Dep. 119:12–**

**14; D. Johnson Dep. 57:3–6. Fulton only ever gave her instructions to back up**

**or leave after he slapped the phone from her hand. D. Johnson Dep. 56:20–23.**

37.  Ms. Johnson retrieved her phone from under the Chambers' car but was ordered to stand against the wall at the front of the building and away from Officer Fulton. (D. Johnson Dep. p. 42:1-12).

**Response:   Disputed only in part. The "but" in this fact implies that Ms.**

**Johnson disobeyed any order by getting her phone, but Fulton admitted that**

**he let her get the phone. Fulton Dep. 119:8–11.**

38.  Even while positioned on the wall, Ms. Johnson continued to ask Officer Fulton for his name repeatedly, and testified that she did

not remember what Officer Fulton was doing at the time. (D. Johnson pp. 38:20-25; 39:1-22; 42:13- 23).

**Response:   Disputed in part. Ms. Johnson testified that she knew that she did not ask Fulton for his name when he was engaged in conversation with the Chambers. D. Johnson Dep 53:23–54:2 ("Q.: So you interrupted his interview? A.: I didn't -- I didn't ask him for his name at that point. Q.: When did you ask for his name? A.: When he got in front of me.").**

39. For continuously invading Officer Fulton's personal space and ignoring his repeated commands to leave the scene and record from a distance, Ms. Johnson was subsequently arrested for misdemeanor obstruction. (D. Johnson Dep., Def. Ex. 8; pp. 43:16-44:23).

**Response:   Disputed, except that obstruction was the offense with which Ms. Johnson was prosecuted.**

**Diane Johnson was only told to back up after her phone had been slapped from her hand, at which time she went to where she was told until she was arrested. D. Johnson Dep. 46:4–6 ("The only time he asked me to leave was after he knocked my phone out of my hand and he told me to get to the wall and I went to the wall like he said."); *id.* at 56:20–23; *id.* 42:1–25.**

Respectfully submitted, this 20th day of November, 2018.

_s/Zack Greenamyre_                         _s/Jeffrey R. Filipovits_
Zack Greenamyre                             Jeffrey R. Filipovits
Georgia Bar No. 293002                      Georgia Bar No. 825553

MITCHELL & SHAPIRO, LLP                     FILIPOVITS LAW, PC
3490 Piedmont Road, Suite 650               2900 Chamblee-Tucker Road, Bldg. 1
Atlanta, Georgia 30305                      Atlanta, Georgia 30341
Phone: 404-812-4747                         Phone: 770-455-1350
Fax: 404-812-4740                           Fax: 770-455-1449
zack@mitchellshapiro.com                    jeff@law.filipovits.com