UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DIANE JOHNSON and<br>ANDRE JOHNSON,<br><br>   Plaintiffs,<br><br>v.<br><br>DEKALB COUNTY, GEORGIA, et al.,<br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br><br>1:17-cv-02601-TWT |

## **PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

Plaintiffs offer the following statement of facts which present a genuine issue for trial as required by Local Rule 56.1(B)(2)(b).

*Facts Leading to Plaintiffs' Arrests*

1. After exiting Bigelow's, Andre, Diane, and Shayla Johnson got into their car and began to exit the parking lot. D. Johnson Dep. 26:9–16.

2. No police officer approached or spoke to the Johnsons between the time they left Bigelow's and got into their car. A. Johnson Dep. 50:17–51:1.

3. As the Johnsons began to exit the parking lot, they noticed that a police car was blocking in their friends' car. D. Johnson 26:9–24.

1

4. The first time the Johnsons encountered Officer Fulton was after they stopped their car prior to exiting the parking lot. D. Johnson 26:9–24.

5. After seeing the Chambers car stopped by Officer Fulton, the Johnsons stopped their car and Diane Johnson exited. D. Johnson Dep. 27:7–12.

6. The reason Ms. Johnson got out of the car was her concern for her friends, the Chambers. D. Johnson Dep. 27:17–23.

*Facts Leading to Ms. Johnson's Arrest*

7. While Ms. Johnson went to check on her friends, Mr. Johnson and Shayla Johnson remained in the car. D. Johnson Dep., 28:2–6.

8. As Ms. Johnson approached Officer Fulton, she identified herself as a friend of the Chambers, that they had been in the bar together, and asked Officer Fulton what was going on. D. Johnson Dep., 28:13–17.

9. Officer Fulton responded by claiming that Mr. Chambers had identified himself as a police officer. D. Johnson Dep. 28:13–20.

10. In response, Ms. Johnson laughed and said "that can't be true." D. Johnson Dep. 29:4–6.

11. Officer Fulton told Ms. Johnson that he was going to lock Mr. Chambers up. D. Johnson Dep. 29:16–19.

12. Ms. Johnson then stated that she was going to get her phone to record the arrest. D. Johnson Dep. 29:20–23.

13. Ms. Johnson then returned to her car to get her phone, and told her husband that Officer Fulton claimed that Mr. Chambers was impersonating a police officer. D. Johnson Dep. 30:12–15.

14. Mr. Johnson then exited the car and returned to the scene with Ms. Johnson. D. Johnson Dep. 30:19–23.

15. Ms. Johnson then returned to the scene, planning to record Mr. Chambers' arrest. D. Johnson Dep. 31:2–8.

16. At the point Ms. Johnson returned, Mr. Chambers was explaining that he never stated that he was a Clayton County police officer. D. Johnson Dep. 31:2–8.

17. Ms. Johnson returned and asked Officer Fulton for his name while she attempted to film him. She did not interrupt Officer Fulton while he was speaking. D. Johnson Dep. 33:17–34:4, 53:9–10, 58:20–22.

18. Ms. Johnson attempted to make a video recording, but she was not successful in doing so. Instead, Ms. Johnson only captured two photos of

Officer Fulton after he approached her. D. Johnson Dep. 32:10–12; Ex. K, Photos from D. Johnson's Phone.

19. At the time Ms. Johnson was trying to record Officer Fulton, and before he knocked the phone from her hand, she was standing approximately eight feet away from him. D. Johnson Dep. 37:3–6.

20. Ms. Johnson did not interfere with Officer Fulton's duties or any investigation of the Chambers. D. Johnson Dep. 37:25–38:5, 38:20–22; A. Johnson Dep. 81:4–16.

21. Officer Fulton knew that Ms. Johnson was attempting to record him. D. Johnson Dep. 37:7–10.

22. As Ms. Johnson attempted to record Officer Fulton, he walked toward her. D. Johnson Dep. 35:22–35:1. Ms. Johnson did not ask Officer Fulton for his name until Officer Fulton stood in front of her. *Id.* at 54:1–2; 58:20–22.

23. Officer Fulton was visibly irritated by Ms. Johnson asking him for his name and filming. D. Johnson 39:9–15.

24. Officer Fulton refused to give his name to Diane Johnson. D. Johnson 33:17–34:4, 38:2–19.

25. Fulton smacked Ms. Johnson's phone out of her hand. D. Johnson 33:17–34:4.

26. Ms. Johnson took two photos of Officer Fulton. D. Johnson Dep. 32:10–12; Ex. K, Photos from Diane Johnson Phone.

27. After Fulton smacked Diane Johnson's phone out of her hand, she said, "Is that what we're doing? We're knocking people's phone out of their hands for asking [for a] name?" D. Johnson Dep. 41:14–17.

28. Ms. Johnson then went to retrieve her phone. D. Johnson Dep. 41:23–24.

29. Officer Fulton then told Ms. Johnson to "get off his scene" and to move to the front wall of the building. This was the first command that Officer Fulton gave to Ms. Johnson. D. Johnson Dep. 41:25–42:9.

30. While standing against the wall, Ms. Johnson put her phone up and against asked Officer Fulton for his name. D. Johnson Dep. 42:15–23.

31. Officer Fulton responded by saying "that's it," and then approached Ms. Johnson and arrested her. D. Johnson Dep. 42:13–23.

*Facts Leading to Mr. Johnson's Arrest*

32. After exiting his car, Mr. Johnson stood approximately eight feet from Officer Fulton and the Chambers' car. A. Johnson Dep. 54:2–4, 55:13–14.

33. As Mr. Johnson approached Officer Fulton, he had his hands raised. A. Johnson Dep. 110:19–23.

34. Mr. Johnson asked Fulton what was going on A. Johnson Dep. 54:24–55:2.

35. Officer Fulton approached him, pushed Mr. Johnson, and told him to turn around. A. Johnson Dep. 54:10–18.

36. Mr. Johnson turned immediately and began to walk away. A. Johnson Dep. 110:24–111:7.

37. As Mr. Johnson turned to walk away, he said to Officer Fulton that Fulton had "no right to put your hands on me." A. Johnson Dep. 56:25–57:5.

38. Mr. Johnson's comment upset Officer Fulton. A. Johnson Dep. 56:5–57:25.

39. After Officer Fulton pushed Mr. Johnson, Mr. Johnson began to leave the scene by walking away. A. Johnson Dep. 55:19–23.

40. As Mr. Johnson continued walking away, he said "this is some bullshit." A. Johnson Dep. 58:1–13.

41. Officer Fulton then replied by telling Mr. Johnson that he could not use the word "bullshit." A. Johnson Dep. 58:9–10, 59:20–60:4.

42. Mr. Johnson then responded by saying "I can say whatever I want to say. It's called freedom of speech, motherfucker." A. Johnson 58:6–13.

43. As Mr. Johnson continued walking away, Officers Fulton and Bowe ran up behind him and placed Mr. Johnson in handcuffs. A. Johnson Dep. 56:11–15; Bowe Dep. 56:6–9.

44. At the time Fulton ran up to arrest Mr. Johnson, the two were approximately twenty feet apart. A. Johnson Dep. 60:9–24.

45. Officer Fulton then placed Mr. Johnson in handcuffs and moved him to a police car. A. Johnson Dep. 61:4–10.

46. Andre Johnson was arrested before Diane Johnson. A. Johnson Dep. 70:24–71:5.

47. Andre Johnson was detained inside Officer Bowe's police car, using Officer Bowe's handcuffs. A. Johnson Dep. 75:25–76:4.

*Allegations Related to Plaintiffs' Monell Claims*

48. DeKalb County's disorderly conduct ordinance makes it unlawful "for any person to act in a loud and boisterous, reckless, unruly or violent manner for the purpose of insulting, degrading, or inciting another or a group of individuals in a public place." Ex. G, DeKalb County Disorderly

Conduct Ordinance. *See also* Doc. 1, Pl. Compl., ¶ 74; Doc. 5, Def. Ans., ¶ 74 (admitting the text of the ordinance).

49. Officer Fulton believes that under the disorderly conduct ordinance, it is lawful to arrest someone "for acting loudly and boisterously for the purpose of degrading another group of individuals in a public place." Fulton Dep. 133:3–23.

50. Officer Fulton believes the disorderly conduct ordinance is constitutional. Fulton Dep. 132:5–133:23.

51. Officer Fulton's understanding that it is lawful to arrest a person for acting loudly and boisterously for the purpose of degrading another group of individuals in a public place is derived from training he received from DeKalb County. Fulton Dep. 133:3–134:2.

52. DeKalb County police officers are not trained that there is a difference between the state disorderly conduct statute and the County's disorderly conduct ordinance. Officers believe that they are able to make a "judgment call" in determining whether to charge someone with a misdemeanor or violation of the ordinance. The only factors that influence

that judgment are which court the officer would prefer to prosecute the case. Bowe Dep. 40:4–15; Harden Dep. 45:6–25.

53. Officer Harden, who was present at the scene of the arrests of the Chambers and Johnsons, believes that Mr. Johnson's arrest was valid based upon the DeKalb County disorderly conduct ordinance, and that the ordinance "informed his assessment" of whether the arrests were legal. Harden Dep. 9:1–10:16; Ex. G, DeKalb County Disorderly Conduct Ordinance.

*Allegations Related to Andre Johnson's Standing*

54. Mr. Johnson intends to speak in a way that violates the DeKalb County ordinance on disorderly conduct. Specifically, he intends to speak in a loud and/or boisterous or unruly fashion for the purposes of insulting or degrading another. A. Johnson Decl. ¶ 2.

55. Mr. Johnson has used words like "bullshit," "fuck," and other profanity in the past and plans to use those words in the future. Specifically, he wopp use those words to stand up for people who he believes are being treated unfairly by those in government, including police officers. A. Johnson Decl. ¶ 5.

9

56. Mr. Johnson has severely limited even setting foot in DeKalb County since and because of his arrest and the fact that his speech subjects him to criminal liability under the DeKalb County ordinance for disorderly conduct. Mr. Johnson believes, based on the conduct of the officers in this case, the text of the disorderly conduct ordinance, and the County's defense of this case, that the use of profanity is illegal in the County. A. Johnson Decl. ¶¶ 3, 6.

57. If the DeKalb County ordinance for disorderly conduct is no longer in effect, Mr. Johnson plans to immediately resume going into DeKalb County and speaking in a fashion that would violate the text of the ordinance. A. Johnson Decl. ¶ 4.

*The Role of Officer Bowe*

58. Officer Bowe arrived on the scene prior to the time Ms. Johnson retrieved her cell phone from her car. Bowe Dep. 52:5–24.

59. Both Officer Fulton and Officer Bowe participated in the arrest of Andre Johnson. Bowe Dep. 51:1–6.

60. There was no crowd during the time the Johnsons were engaging with Officer Fulton and Officer Bowe. *See* A. Johnson Dep. 48:12–18, 107:10–

25. There was no threat of a disruption of the peace that came from Plaintiffs. A. Johnson Dep. 111:7 (describing Fulton approaching him to push him); D. Johnson Dep. 58:4–16 (describing Fulton's response to a question for his name by coming up to her and knocking her phone out of her hand); Ex. H, Diane Johnson Decl. ¶¶ 8–10.

61. Officer Bowe observed Andre Johnson's conduct leading up to the time of his arrest. Bowe Dep. 57:6–8.

62. Officer Bowe agreed with the recitation of facts in Officer Fulton's arrest warrant application. Bowe Dep. 32:13–33:2.

*The Arrest Warrants*

63. Fulton swore that she "continuously invad[ed] my private space" and "ignor[ed] my lawful order . . . to leave the scene and record with her cell phone from a distance." *See* Ex. C, Diane Johnson Arrest Warrant.

64. Mr. Johnson, Fulton swore that he "placed [Fulton] in reasonable fear of [his] safety by refusing to leave the scene and by stating in a loud and boisterous manner . . . 'man this some bullshit, Yall some bitches, Its""'s called freedom of speech motherfuckers.'" [Sic]. *See* Ex. D, Andre Johnson Arrest Warrant.

11

*Allegations Related to Fulton's Destruction of Evidence*

65. Fulton testified was wearing a body camera on the night that he arrested Plaintiffs. Fulton Dep. 111:2–9.

66. He wrote in his police report that he recorded at least as early into the interaction as when Mr. Chambers made his statement saying that he was a current police officer, *id.* 103:19–24, which was well before the Johnsons came into the picture, *see id.* 100:14–20 (explaining that Mr. Chambers allegedly made this statement before calling for backup and before the Chambers made it to their car); A. Johnson Dep. 52:2–7 (testifying that the Chambers were in their car when he first saw Fulton speaking with the Chambers).

67. Fulton wrote his police report, in which he stated that he had activated his body camera, from his laptop, Fulton Dep. 75:15–20, where he was able to plug in his body camera to view the video, *id.* 125:20–126:6.

68. Fulton stated in his deposition that he recognized on the night of the arrests that he realized that the body camera had not functioned, which was the same time that he wrote his police report. *Id.* 124:13–21.

69. Fulton later gave a statement to internal affairs, who were investigating the incident before his resignation, stating that neither the video or the audio were captured by his camera. *Id.* 123:16–124:12; 15-067391; Ex. A, Officer Fulton.WMA, at 3:45.

70. Fulton also gave a statement to the DeKalb County Solicitor's Office where he stated that his camera had recorded audio but not video. *Id.* 104:5–15; State vs. Charity Chamber Officer Fulton Interview.WMA, at 7:20. He stated that he then lost the audio files at a later date. *Id.*

71. Fulton stated that the body camera was issued by the DeKalb County Police Department, Fulton Dep. 125:5–6.

72. Other evidence shows that the camera was one he had purchased personally outside of the department. *See* Ex. F, September 24, 2018 Open Records Response (showing that body cameras were not issued to DeKalb Police at the relevant time and that there were no records regarding any body camera issued to Deron Fulton).

*Allegations Related to Fulton's Prior Acts*

73. Fulton disrupted the eviction of a family member by the DeKalb Sheriff's Office, cursing at officers, asking if they had ever been shot at, and

refusing commands to leave the scene. Fulton was arrested at the scene, but then released without charges. Internal affairs sustained allegations of conduct unbecoming. Internal affairs also found that Fulton engaged in deception when answering questions about the incident. Fulton Dep. 35–47.

74. While working an off-duty job without department permission, Fulton got into an argument with civilians, and had his 16 year-old brother bring him his duty belt and service firearm. Fulton then stood by as his brother racked a round into the chamber of Fulton's service firearm. Internal affairs sustained allegations of conduct unbecoming. Fulton Dep. 31–35.

75. Internal affairs sustained complaints of neglect of duty and failure to comply with orders against Fulton for conduct underlying a stop and arrest of a pedestrian. The pedestrian complained that the officers stole money from him. When Fulton responded to questions about what had happened with the money and whether he had searched the wallet, deception was indicated in his responses, as well as those of the other officer involved in the stop. Fulton Dep. 48.

76. While working an off-duty job at Waffle House, according to his superior officer at the scene, Fulton demanded that someone who was unobtrusively recording an incident with other officers stop filming with their phone. When that person declined to do so, Fulton took the phone from them and arrested them. Fulton was then ordered to release the person and give their phone back. That supervisor noted that Fulton's version of events departed from the arrestee's video. Fulton Dep. 50–53.

77. Fulton, while off-duty, entered into a church on Sunday morning with his firearm in his basketball shorts and used profanity in front of the congregation, threatening the Bishop and others. Witnesses reported that Fulton attempted to strike the Bishop during Sunday school services, and that others had to intervene. Fulton Dep. 57–61.

78. Officer Fulton wrote in his police report that: "Ms. Chambers stated in a loud and boisterous manner," "Ms. Chambers was very rude and disrespectful toward me," and described Mr. Johnson's speech as being made in a "boisterous manner." Ex. E, Fulton Incident Report, at 3.

Respectfully submitted, this 20th day of November, 2018.

| | |
|---|---|
| *s/Zack Greenamyre* | *s/Jeffrey R. Filipovits* |
| Zack Greenamyre | Jeffrey R. Filipovits |
| Georgia Bar No. 293002 | Georgia Bar No. 825553 |
| | |
| MITCHELL & SHAPIRO, LLP | FILIPOVITS LAW, PC |
| 3490 Piedmont Road, Suite 650 | 2900 Chamblee-Tucker Road, Bldg. 1 |
| Atlanta, Georgia 30305 | Atlanta, Georgia 30341 |
| Phone: 404-812-4747 | Phone: 770-455-1350 |
| Fax: 404-812-4740 | Fax: 770-455-1449 |
| zack@mitchellshapiro.com | jeff@law.filipovits.com |